**Opinion issued December 19, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00178-CV

_____

**DAVID VUONG AND TOMMY T. NGUYEN, Appellants**

**V.**

**TAIWAI LUK, Appellee**

On Appeal from the 113th District Court
Harris County, Texas
Trial Court Case No. 2008-38471

# MEMORANDUM OPINION[1]

The trial court found appellant Tommy Nguyen liable for violating the Deceptive Trade Practices Act ("DTPA") in the course of selling a restaurant to appellee Taiwai Luk. The trial court further found appellant David Vuong, who drafted the bill of sale for Nguyen and Luk, liable for legal malpractice. The trial court entered judgment against Nguyen and Vuong, jointly and severally, for $62,600, representing the amount Luk invested in the restaurant. The trial court further ordered Nguyen to pay $125,200 in treble damages for a knowing violation of the DTPA and $25,000 for Luk's legal fees relating to that claim. Both Nguyen and Vuong appeal.

In his sole issue, Nguyen challenges the sufficiency of the evidence to support the trial court's judgment. Specifically, he argues that Luk's incompetence led to his business failure, that he did not breach his contractual obligations, that Luk failed to establish his damages, and that the trial court erred in admitting "expert testimony from unqualified witnesses."

---

[1] Appellant David Vuong has moved for en banc reconsideration. A majority of the en banc court, consisting of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Massengale, Brown, and Huddle, has reviewed Vuong's motion for reconsideration en banc, and it is denied. Justice Keyes dissents from the denial of en banc reconsideration. We withdraw the opinion and judgment issued on January 17, 2013, and we issue this per curiam opinion and judgment in their stead.

Vuong argues, in three issues, that: (1) the judgment against him is impermissible because it would award Luk a "double recovery"; (2) his actions were not the proximate cause of Luk's damages; and (3) the evidence is legally insufficient to support the trial court's findings of legal malpractice.

We affirm.

## Background

On December 11, 2007, Gary Rosenbaum leased a restaurant space at 2118 Clinton Drive to Nguyen for the purpose of operating a Wild Wild Wings restaurant. The lease term was one year beginning on March 1, 2008. Specifically, the lease provided that Nguyen, as lessee, "shall use the leased premises for the purpose of operating a restaurant, titled 'Wild Wild Wings' and allied businesses connected therewith." Paragraph VI of the lease stated: "Lessee further covenants that he/she will not assign this lease or his/her rights under said lease, nor sublet the whole or any part of said premises . . . without the consent of the Lessor in writing and such consent shall not unreasonably be withheld."

In January 2008, Nguyen met Luk. Luk was interested in purchasing a restaurant and Nguyen showed him two restaurant locations, including the Wild Wild Wings restaurant, which was not yet open because Nguyen was remodeling. Luk decided to purchase the Wild Wild Wings restaurant from Nguyen.

3

On February 2, 2008, Luk agreed to pay Nguyen $60,000 for the Wild Wild Wings restaurant. That same day, Nguyen and Luk visited the office of attorney David Vuong to complete the bill of sale and close the transaction. The bill of sale provided that the transferred business was the Wild Wild Wings Restaurant located at 2118 Clinton Drive, Galena Park, Texas. The bill of sale further provided that

> Seller [Nguyen] shall sell, assign, transfer, convey, and deliver to Buyer [Luk], and Buyer shall purchase from Seller, on the Closing Date (defined herein), all of the right, title and interest in and to all of the assets of Seller, more particularly all the assets of Wild Wild Wings Restaurant located at 2118 Clinton Dr. Galena Park . . . as adjusted in the normal course of business prior to Closing, to include, but not limited to the following:
>
> - Seller agrees to train Buyer for one month and to give recipes to Buyer; however Buyer promises not to give recipes to anyone else without the approval of Seller in writing. Exception, if in the future Buyer is to [sell] the restaurant Buyer is allowed to teach and train the new Buyers and give recipes to new Buyers.
>
> - One Wok

The bill of sale did not define the term "Closing Date," but it provided that "Buyer begins to move in as of February 2, 2008." The bill of sale also included an "as is" provision which stated:

> WITH THE EXCEPTION OF THE WARRANTIES OF TITLE, INCLUDING THE WARRANTY THAT NO LIENS EXIST ON THE TRANSFERRED PROPERTIES EXCEPT AS RECITED, SELLER HAS MADE NO AFFIRMATION OF FACT OR PROMISE RELATING TO THE TRANSFERRED PROPERTIES THAT HAS BECOME ANY BASIS OF THIS BARGAIN, AND FURTHER, SELLER HAS MADE NO AFFIRMATION OF FACT OR PROMISE RELATING TO THE TRANSFERRED

4

PROPERTIES THAT WOULD CONFORM TO ANY SUCH AFFIRMATION OR PROMISE. SELLER DISCLAIMS ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE WHATEVER WITH RESPECT TO THE TRANSFERRED PROPERTIES. THE TRANSFERRED PROPERTIES ARE SOLD ON AN "AS IS" BASIS.

Finally, the bill of sale contained the following representation, among others: "Seller has authority to convey the Property to Buyer. This contract is, and all documents required by this contract to be executed and delivered to Buyer at closing will be, duly authorized, and delivered by Seller."

Luk paid Nguyen $60,000 in the form of a cashier's check. At Nguyen's direction, the cashier's check was made payable to Tra My Pham, an associate of Nguyen. Luk also paid Vuong $300 for his work in drafting the bill of sale.

Nguyen then helped Luk make sauces for one month, filed the proper paperwork with Harris County to withdraw himself as the owner of the restaurant as listed on an assumed name certificate, and gave Luk the recipes for the restaurant as agreed in the bill of sale. Luk also purchased a refrigerator and two stoves for use in the restaurant.

On February 25, 2008, Luk opened the restaurant. In late March, Nguyen and Luk met with Rosenbaum to discuss assigning the lease to Luk. Nguyen told Rosenbaum that Luk was his father and asked permission to "slide" the lease over to Luk while Nguyen was in Vietnam. Rosenbaum repeatedly refused this request. Rosenbaum later accepted payment of rent for the month of April 2008 from Luk,

5

believing that Luk was paying on behalf of Nguyen because Nguyen had often paid in cash or had others pay for him.

On April 4, 2008, Luk informed Rosenbaum that he would no longer operate the restaurant, returned the keys to the leased space to Rosenbaum, and left the restaurant. This was the first time Rosenbaum was informed that Luk had been operating the restaurant and not Nguyen. Rosenbaum called Nguyen, who reopened the restaurant the next day and continued to operate the restaurant through the original lease term.

Luk filed suit against Nguyen and Vuong. He later amended his petition to include Tra My Pham and Chick & Wings, Inc., a company that Nguyen at some point claimed to represent in the transaction to sell the Wild Wild Wings restaurant. Pham and Chick & Wings, Inc. failed to appear, and the trial court entered default judgments against each of them in the amount of $61,100, which included the cost of purchasing the restaurant, April 2008 rent, and the amount Luk paid to David Vuong for preparing the bill of sale. These judgments were severed from the suit against Nguyen and Vuong and became final.

Luk claimed that Nguyen had breached a contract with Luk by not properly training him and by not providing the correct recipes. He also claimed that Nguyen had made fraudulent misrepresentations; that he had made negligent misrepresentations concerning the ability to assign the lease when he stated that

6

Rosenbaum would allow the assignment and would give Luk a lease for five years at $800 per month; and that Vuong and Nguyen had conspired to commit fraud against him. He also asserted the Vuong had committed legal malpractice.

At the bench trial, Nguyen testified that Rosenbaum had given him "a note saying that he—whoever want[s] to come in—as long as me or Mr. Luk who paid the lease—who paid the rent for the space, it should be okay." Nguyen testified that he gave this note to his attorney, but the attorney did not know what Nguyen was referring to. The note was never produced at trial. Nguyen again stated that both he and Luk went to Rosenbaum and that Rosenbaum's only concern was that he receive the rental payments. Nguyen agreed that he introduced Luk as his father when they met with Rosenbaum.

Regarding his ownership interest in the Wild Wild Wings restaurant, Nguyen originally testified that he was not an owner, that he just worked there doing construction, and that Tra My Pham was the owner. He testified that he was listed as an owner on the assumed name filing with Harris County because he was the one who spoke English, so he signed the form. On cross-examination, Nguyen testified that he was the legal owner of the restaurant, but he did not personally put any money into the business.

Regarding the deal with Luk, Nguyen testified that he understood that Luk was paying $60,000 for everything in the restaurant, including the assignment of

7

the lease. He testified that he and Luk signed a purchase agreement on the morning of February 2, 2008 that he had drafted himself, but Luk did not want to pay the $60,000 until they had an attorney draw up the papers.[2] He testified that after Luk gave him the cashier's check made payable to Tra My Pham, Nguyen completed his obligation to train Luk and then did not visit the restaurant again.

Luk testified that Nguyen represented himself as the owner of Wild Wild Wings. Luk stated that he asked Nguyen to see the lease, but Nguyen never provided it, and Luk did not know that he needed the landlord's written permission before he opened the restaurant. Luk also testified that Nguyen assured him that Rosenbaum would allow Luk to operate the restaurant under Nguyen's lease for three months and would then give Luk a new lease for five years at the rate of $800 per month.

Luk testified that he went to Vuong's office because he wanted a lawyer to witness and memorialize the agreement between Nguyen and himself in order to show that he had purchased the restaurant. Vuong testified, however, that he acted as a scrivener in memorializing the transaction between Luk and Nguyen and that he did not give either of them legal advice. He also testified that he explained that

---

[2] Nguyen offered a copy of the purchase agreement into evidence, but Luk objected, arguing that there was a line through the second page that appeared to have been made by a copy machine that was not present on the first page. Luk's counsel stated, "We believe that the second page was taken from some other document and attached to this first page, and we object to the authenticity of this document." The trial court sustained the objection.

the landlord was the most important person in the transaction and that Luk needed to have the assignment of the lease in writing. He also explained to Luk and Nguyen the details of how purchases of businesses that lease space usually occur. Vuong testified that he encouraged Luk to hire him to pursue obtaining a written assignment of the lease, for which he would charge Luk $1,500, but Luk refused to engage his services for that purpose. According to Vuong, Luk was in a hurry to complete the transaction and did not have the money to pay an additional $1,500 in legal fees. Nguyen testified that Vuong spoke privately with Luk at one point.

Vuong drafted the bill of sale using a form book and/or his knowledge and experience as an attorney and received $300 as payment from Luk. There was no written fee agreement or description of the scope of the relationship between himself and Luk.

Following the February 2, 2008 transaction, Luk acted as the owner of Wild Wild Wings. He obtained a business license to operate the restaurant, identifying himself as the owner. He opened the restaurant at the end of February 2008.

Rosenbaum testified that Nguyen first approached him about assigning the lease around March 24 or 25, 2008. Nguyen introduced Luk as his father and as the cook for the restaurant. Nguyen asked if he could "slide" the lease over to his father and Rosenbaum refused. Rosenbaum testified that he said no "at least 20 times" and "kept saying 'no' until they finally left." He testified that Nguyen

could not have been mistaken that Rosenbaum refused to assign the leave and he "acted very disappointed."

Rosenbaum testified that Luk met with him once on his own, on April 1, 2008. Luk paid the April rent with a personal check, and Rosenbaum did not "remember him saying very much." However, Luk testified that when he delivered the April rent to Rosenbaum, he asked Rosenbaum about assigning the lease to him, and Rosenbaum refused. That was when Luk realized that Nguyen had lied to him about the lease. Rosenbaum did not know at that time that Nguyen had sold the restaurant to Luk. It was not until Luk returned on April 4, 2008 to inform him that he quit and to hand over the keys that Rosenbaum knew what had happened. He testified that he "would never accept Mr. Luk as a tenant" and that he would have evicted him if he had not already left.

Both Luk and Rosenbaum testified that the restaurant without a lease was worth nothing. Nguyen objected to this on the grounds that Rosenbaum's testimony was speculative and that Luk's testimony was in response to a leading question.

Finally, Frederick Dailey, an attorney, testified as an expert witness on Luk's behalf. He testified regarding the nature of the relationship between Vuong, Luk, and Nguyen, and he concluded that Vuong did more than merely write down Luk and Nguyen's agreement. Dailey testified that, in his opinion, Vuong and Luk

had an attorney-client relationship, that Vuong breached the duties he owed to Luk in multiple ways, and that Vuong's acts or omissions were the cause of Luk's damages. Dailey testified that Vuong's negligence in drafting the bill of sale "without protecting against the potential of not having an approved assumption of the lease" caused Luk's damages. Dailey stated that Vuong could have protected against that potential situation in "a number of different ways" including conditioning the bill of sale on Rosenbaum's written approval to assign the lease or including a clause for refund of the purchase price in the event Rosenbaum refused the assignment.

The trial court concluded that Luk was a consumer under the DTPA; that he detrimentally relied upon Nguyen's false, misleading, or deceptive acts or practices as enumerated in Business and Commerce Code sections 17.46(b)(2), (5), (12), (20), and (24), which were a producing cause of Luk's damages; that Nguyen breached an expressed warranty, which was the producing cause of Luk's damages; and that Nguyen's violation of the DTPA was knowing. The trial court also concluded that Vuong formed an attorney-client relationship with Luk; that "Vuong stepped outside the role of a mere scrivener and into the role of an attorney with duties owed to the client"; and that Vuong "did not disclaim, waive, or limit the scope of the attorney-client relationship he formed with Luk." The court found that Luk did not waive or consent to the potential conflict of interest as a result of

11

Vuong's preparation of the bill of sale between Nguyen and Luk and that Luk did not waive any duty or standard of care owed him by Vuong. The trial court concluded that Vuong committed legal malpractice that was the cause-in-fact and proximate cause of Luk's damages. The trial court also made numerous findings of fact in support of its conclusions of law.

The trial court held Nguyen and Vuong jointly and severally liable for $62,600—which represented the amount paid for the restaurant pursuant to the bill of sale, the stoves and refrigerator Luk had purchased for the restaurant, and Vuong's fee for preparing the bill of sale. The court held Nguyen liable for an additional $125,200 in treble damages based on the finding that Nguyen knowingly violated the DPTA. Finally, the trial court ordered Nguyen to pay Luk's attorney's fees related to the intertwined DTPA and breach of contract claims in the amount of $25,000. Both Nguyen and Vuong appealed.

## NGUYEN'S APPEAL

In his sole issue, Nguyen argues that the evidence is insufficient to support the judgment.

### A. Standard of Review

A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In a legal

12

sufficiency, or "no-evidence" review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In conducting this review, we credit favorable evidence if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. We must sustain a no-evidence contention only if (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

In reviewing a challenge to the factual sufficiency of the evidence, we "must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston

13

[1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)).

The fact-finder is the sole judge of witnesses' credibility; it may choose to believe one witness over another, and a reviewing court cannot impose its own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468. Because it is the fact-finder's province to resolve conflicting evidence, we must assume that it resolved all conflicts in accordance with the verdict if reasonable people could do so. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468.

Several of Nguyen's arguments on appeal relate to Luk's allegations of breach of contract. Specifically, Nguyen contends that the evidence is insufficient to show that he breached the bill of sale. He argues that he was not required to deliver a warranty deed for the restaurant and that he complied with the other terms of the bill of sale. He further argues that he did not breach any oral agreement with Luk relating to the assignment of the lease because his obligation to perform had not yet come due, as Luk abandoned the property before the three-month period elapsed. However, the trial court did not make any findings that Nguyen breached the bill of sale or other contract, and the judgment against Nguyen was not based

14

on a breach of contract.[3] It was based on the trial court's findings that he violated the DTPA. Therefore, we examine the sufficiency of the evidence to support the trial court's judgment under the DTPA.

## B. DTPA

The trial court entered judgment against Nguyen based on its findings that Nguyen violated the DTPA by employing false, misleading, or deceptive acts or practices and by breaching an express warranty. These two findings are distinct and either will support recovery. *See Mays v. Pierce*, 203 S.W.3d 564, 571–72 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Teague v. Bandy*, 793 S.W.2d 50, 54 (Tex. App.—Austin 1990, writ denied). The trial court found that Nguyen's violations were the producing cause of Luk's damages and that Nguyen committed them knowingly.

The DTPA provides:

(a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:

---

[3] Nguyen also argues that any oral agreement to assign the lease made prior to the execution of the bill of sale is not valid, and thus the trial court could not find that Nguyen breached "a contractual provision that did not exist." We have already stated that the trial court's judgment was not based on breach of contract. To the extent that Nguyen is arguing that the trial court's finding that he breached an express warranty was erroneous, we note that "a claim for breach of warranty is separate from a claim for false, misleading, or deceptive acts," and "a consumer is not prevented from bringing a DTPA action against a defendant merely because the defendant also breached a contract." *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 666 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

15

(1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:

(A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and

(B) relied on by a consumer to the consumer's detriment; [or]

(2) breach of an express or implied warranty.

TEX. BUS. & COM. CODE ANN. § 17.50(a) (Vernon 2011).

The trial court found that Nguyen committed false, misleading, or deceptive acts or practices that violated subsections (2), (5), (12), (20), and (24) of section 17.46(b). The subsections provide that false, misleading, or deceptive acts or practices include:

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . .

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not; . . .

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; . . .

(20) representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve . . . ; [and]

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure

16

> to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

*Id.* § 17.46(b)(2), (5), (12), (20), and (24).

Thus, to establish a DTPA claim under subsection 17.50(a)(1), the plaintiff must produce evidence: (1) that he was a consumer; (2) that the defendant engaged in at least one of the "laundry list" items enumerated in section 17.46(b); (3) that he detrimentally relied on the false, misleading, or deceptive act or practice; and (4) that the false, misleading, or deceptive act or practice was a producing cause of his injury. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 21 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The producing cause element requires some showing that the defendant's act or omission was a cause in fact of the plaintiff's injury. *Id.* at 21–22. Producing cause is "a substantial factor which brings about the injury and without which the injury would not have occurred." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995); *Beckman*, 305 S.W.3d at 22. The plaintiff need not establish that the harm was foreseeable. *Doe*, 907 S.W.2d at 481. There can be more than one producing cause of an event. *Rourke v. Garza*, 511 S.W.2d 331, 339 (Tex. Civ. App.—Houston [1st Dist.] 1974), *aff'd*, 530 S.W.2d 794 (Tex. 1975).

If the defendant's conduct was committed knowingly, the consumer may recover not more than three times the amount of economic damages. TEX. BUS. & COM. CODE ANN. § 17.50(b)(1) (Vernon 2011); *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 396 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The DTPA defines "knowingly" as:

> [A]ctual awareness, at the time of the act or practice complained of, of the falsity, deceptions, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty . . . actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

TEX. BUS. & COM. CODE ANN. § 17.45(a)(9) (Vernon 2011); *see also St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53–54 (Tex. 1998) (per curiam) (defining "actual awareness" as "a person knows that what he is doing is false, deceptive, or unfair . . . [and does] it anyway").

## C.    Analysis

Nguyen does not challenge the trial court's finding that Luk was a consumer under the DTPA. Nguyen contends that he believed he had Rosenbaum's permission to assign the lease. He also contends that Luk did not detrimentally rely on his representations regarding assignment of the lease. He argues that Luk caused his own damages by abandoning the restaurant while he was under no threat of eviction and by his own incompetence.

18

*i.* ***False, misleading, or deceptive act enumerated in section 17.46(b)***

The trial court found that Nguyen "represented and warranted that the landlord agreed to the assignment of the lease and that the landlord was going to give Luk a lease [for a term of] five years at $800 per month." The trial court further found that Nguyen "failed to disclose to Luk the true terms of the lease, that the lease required the landlord's prior written consent to the sale of the restaurant to Luk, and that failure to obtain the landlord's prior written consent would result in the immediate termination of the lease without notice."

Nguyen argues that he believed he had Rosenbaum's permission to assign the lease. Nguyen testified that he and Luk spoke to Rosenbaum, and Rosenbaum stated that he did not care who was paying the rent as long as he got paid. Nguyen also testified that he had received a written note from Rosenbaum giving him permission to assign the lease to Luk, but he was unable to produce the note at trial.

However, Nguyen also testified that he was aware of the terms of his lease with Rosenbaum and that he knew before he signed the bill of sale that the lease required him to get Rosenbaum's permission before he could assign the lease. Nguyen stated that he understood that the assignment of the lease was part of the deal he made with Luk.

Luk testified that Nguyen represented himself as the owner of Wild Wild Wings and told him that he could assign the lease. Luk testified that he asked to see the lease, but Nguyen never provided it, and Luk did not know that he needed Rosenbaum's written permission before he opened the restaurant. Luk further testified that, prior to their execution of the bill of sale, Nguyen assured him that Rosenbaum would allow Luk to operate the restaurant under Nguyen's lease for three months and would then give Luk a new lease for five years at the rate of $800 per month.

Rosenbaum testified that Nguyen did not ask him to assign the lease until the end of March 2008, more than a month after Luk and Nguyen executed the bill of sale and Luk began operating the Wild Wild Wings restaurant as the owner. Rosenbaum testified that he refused to assign the lease to Luk at that meeting and that he would never have agreed to assign the lease to Luk.

Considering the evidence in the light most favorable to the trial court's finding, we conclude that there is more than a scintilla of evidence that Nguyen made a false, misleading, or deceptive act as enumerated in section 17.46(b)(12). *See* TEX. BUS. & COM. CODE ANN. § 17.46(b)(12) (providing that "false, misleading, or deceptive act" includes "representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law"); *City of Keller*, 168 S.W.3d at 822, 827 (providing

standard of legal-sufficiency review). Thus the evidence was legally sufficient to support the trial court's findings that Nguyen employed a false, misleading, or deceptive act. *See Formosa Plastics Corp.*, 960 S.W.2d at 48 (providing that anything more than scintilla of evidence is legally sufficient).

Furthermore, considering and weighing all the evidence, we conclude that the judgment is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Arias*, 265 S.W.3d at 468. Although Nguyen testified that he believed he had Rosenbaum's permission to assign the lease, Nguyen was never able to produce the note that he allegedly received from Rosenbaum, and Rosenbaum's own testimony indicated that he never gave Nguyen permission to assign the lease. The trial court, acting within its province as fact-finder, made findings indicating that it did not believe Nguyen's testimony, and we assume that it resolved all conflicts in the evidence in accordance with the verdict if reasonable people could do so. *See City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468. Thus, the evidence was factually sufficient to support the trial court's findings that Nguyen employed a false, misleading, or deceptive act.

### ii. *Detrimental reliance*

The trial court found that Luk detrimentally relied on Nguyen's representation that Rosenbaum agreed to assign the restaurant lease to him and that Rosenbaum would grant Luk a lease for $800 a month for a term of five years.

21

Nguyen argues that Luk did not rely on his representation that he had permission to assign the lease because Luk was fully aware that Rosenbaum had the option to refuse the assignment prior to purchasing the restaurant. To support his argument, Nguyen points to Luk's testimony that he went to attorney David Vuong because he wanted a guarantee that he would obtain the lease after three months. Luk testified that he wanted "to protect [him]self, so that's why [he went] to David Vuong's office to have him prepare a new contract for the purchase of the restaurant before [he got] the new contract with the landlord." Nguyen also cites Vuong's notes from his meeting with Nguyen and Luk that make a vague reference to "scenarios of discussing . . . 'money if landlord rejects' and then it references a second store and a third store and something about 'until moved in.'"

However, the fact that Luk wanted a document drafted by an attorney to guarantee that Nguyen would perform as he promised, i.e., that Nguyen would assign him the lease, does not indicate that Luk knew that Rosenbaum could refuse the assignment. Luk testified that Nguyen told him Rosenbaum had already agreed to the assignment and to grant him a new lease after three months. Regarding any discussion of what Luk was told at the meeting with Vuong, Luk testified that Vuong did not explain to him that he could lose his entire investment if Rosenbaum refused the assignment or indicate that there were any potential problems associated with the lease.

22

Vuong himself testified that he did not look at Nguyen's lease, nor did he inform Luk that Rosenbaum could reject the transaction. He only told Luk that "[t]o do it correctly, you need to have—contact the landlord" and that Luk needed to have the assignment in writing. Vuong testified that both Nguyen and Luk indicated that they had already talked to Rosenbaum.

Furthermore, Luk testified that, of the two restaurants Nguyen showed him, he chose the restaurant at 2118 Clinton Drive because the rent offered by Nguyen was a good deal. He testified that, without the lease, the restaurant was worthless.[4] Nguyen also testified that, when Luk accepted the deal, he told Ngueyn "that he like it so much, the rent is cheap, he like the location, everything [sic]," so they finished the deal.

Nguyen further argues that, even if Luk relied on those representations, "Luk did not do so to his detriment since Luk caused his own damages." Nguyen argues that Luk abandoned the restaurant of his own volition and that Luk's incompetence at running the restaurant was the reason behind Luk's abandonment. Nguyen cites

---

[4]    Nguyen argues on appeal that the trial court erred in allowing both Luk and Rosenbaum to testify that the value of the restaurant without a valid lease was "zero" because they were not qualified as experts. However, he did not object on this basis at trial. At trial, Nguyen objected to the testimony of Rosenbaum as being speculative and to the questioning of Luk as being leading. Thus, Nguyen cannot raise an objection to Rosenbaum's and Luk's qualifications as experts for the first time on appeal. *See Nissan Motor Co. Ltd v. Armstrong*, 145 S.W.3d 131, 143–44 (Tex. 2004) (holding complaint concerning witness's qualification as expert was not preserved because pretrial motion to exclude asserted only that wintess's opinions were unreliable).

Rosenbaum's testimony that he did not take any action to evict Luk and that Luk was a terrible cook and told him "everyone's gone" before he handed over the keys. Nguyen also argues that Rosenbaum's act of allowing Nguyen to operate the restaurant through the end of their lease indicates that Rosenbaum would not have terminated the lease.

However, Luk testified that, after he met with Rosenbaum while paying the April 2008 rent and Rosenbaum refused to assign the lease to him, Luk felt that he had been cheated and that he had no right to the restaurant, so he left. Rosenbaum testified that he did not attempt to evict Luk before Luk left the restaurant, but that was only because he was not aware of the sale of the restaurant. Rosenbaum stated that, once he became aware, on April 4, 2008, that Nguyen had sold the Wild Wild Wings restaurant to Luk, he would have sought to evict Luk immediately had Luk not already left. He stated that he would have sought the eviction on the ground that the lessee, Nguyen, had abandoned the property and that he would never have assigned the lease to Luk.

Thus, considering the evidence in the light most favorable to the trial court's findings, we conclude that there is more than a scintilla of evidence that Luk detrimentally relied on Nguyen's representations about the assignment of the lease in purchasing the restaurant. *See City of Keller*, 168 S.W.3d at 822 (providing standard of legal-sufficiency review). Luk's own testimony supports the trial

24

court's findings that he detrimentally relied on Nguyen's representations. *See Formosa Plastics Corp.*, 960 S.W.2d at 48 (providing that anything more than scintilla of evidence is legally sufficient). Thus, the evidence is legally sufficient.

The evidence is also factually sufficient. The evidence that Nguyen relies on to show that Luk was aware Rosenbaum could refuse the assignment—Luk's testimony about his reasons for seeking an attorney to draw up the agreement between himself and Nguyen and his testimony about Vuong's notes from that meeting—is not so overwhelming, when viewed in the context of all of the evidence presented at trial, as to indicate that the judgment was against the great weight and preponderance of the evidence. *See Cain*, 709 S.W.2d at 176; *Arias*, 265 S.W.3d at 468. Vuong himself testified that he did not inform Luk that Rosenbaum could reject the transaction. Luk likewise testified that he was not aware of the terms of Nguyen's lease with Rosenbaum and that he relied on Nguyen's representation that Rosenbaum would allow Luk to lease the property. The evidence also indicated that Luk abandoned the property only after Rosenbaum refused to assign the lease to him and he became aware that Nguyen had misled him. Thus, the fact that Rosenbaum had not yet acted to evict him and Luk's alleged incompetence at operating the restaurant are irrelevant.

### iii. *Damages*

The trial court found that Luk paid $60,000 to Nguyen's agent, Pham, for ownership of the restaurant and that Luk purchased $2,300 in equipment in reliance upon Nguyen's representation that Rosenbaum would assign the lease to him. It further found that Luk lost $62,600 (the amounts above plus the fee he paid to Vuong) when Rosenbaum refused to assign the lease to Luk.

Nguyen does not challenge the trial court's finding on producing cause, nor does he challenge the specific amount of damages found by the trial court. Rather, he argues that Luk failed to mitigate his damages by relocating the restaurant to a new location. Nguyen cites *Frank v. Kuhnreich* to support his proposition that a "lessee has a duty to mitigate the damages, if possible." 546 S.W.2d 844, 851 (Tex. Civ. App.—San Antonio 1977, writ ref'd n.r.e.). However, when a defendant fails to prove the amount of damages that could have been avoided, it is not entitled to any reduction in damages. *See Cole Chem. & Distrib., Inc. v. Gowing*, 228 S.W.3d 684, 688 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Nguyen put forth no evidence at trial to show the amount of damages Luk could have avoided. Therefore, assuming, without deciding, that Luk had a duty to mitigate his damages, Nguyen is not entitled to a reduction of the damages award. *See id.*

Finally, Nguyen argues that the trial court erred when it did not consider the default judgments against Pham and Chick & Wings, Inc. when it entered

judgment against him jointly and severally with Vuong. He claims this is a windfall in favor of Luk that must be reversed. However, neither Nguyen nor Vuong raised this complaint in the trial court. Thus, it has not been preserved for appellate review. *See* TEX. R. APP. P. 33.1(a)(1); *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co.*, 335 S.W.3d 297, 308 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (holding that party cannot raise complaint about double recovery for first time on appeal).

Therefore, we conclude that the evidence was legally and factually sufficient to support the trial court's judgment that Nguyen violated the DTPA.

We overrule Nguyen's sole issue.

## VUONG'S APPEAL

In three issues, Vuong argues that: (1) the judgment against him is impermissible because it would award Luk a "double recovery"; (2) his actions were not the proximate cause of Luk's damages; and (3) the evidence is legally insufficient to support the trial court's findings of legal malpractice.

## A. Impermissible Recovery

In his first issue, Vuong argues that the judgment against him is impermissible because it would award Luk a double recovery. Like Nguyen, he argues that the trial court failed to consider the earlier default judgments against Pham and Chick & Wings, Inc. in rendering its judgment against himself and

Nguyen. Vuong argues that "[i]t was not until a judgment was entered against [him] that [he] was required to complain, which he does in this [a]ppeal." However, he cites no support for the proposition that he was not required to present a complaint on this ground to the trial court. As we have already discussed, Vuong failed to raise this complaint in the trial court, either pre- or post-judgment. Thus, it has not been preserved for appellate review. *See* TEX. R. APP. P. 33.1(a)(1); *Reservoir Sys., Inc.*, 335 S.W.3d at 308 (holding that party cannot raise complaint about double recovery for first time on appeal).

We overrule Vuong's first issue.

**B.     Sufficiency of Legal Malpractice Finding**

In his second and third issues, Vuong argues that his actions were not the proximate cause of Luk's damages and that the evidence is legally insufficient to support the trial court's findings of legal malpractice.

### i.     *Legal malpractice*

Generally, to recover on a claim of legal malpractice, a plaintiff must prove that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred. *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004) (quoting *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995)); *Williams v. Briscoe*, 137 S.W.3d 120, 124 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The

28

attorney-client relationship is a contractual relationship that arises from a lawyer's agreement to render professional services for a client. *See Kennedy v. Gulf Coast Cancer & Diagnostic Ctr. at Se., Inc.*, 326 S.W.3d 352, 357 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Greene's Pressure Treating & Rentals, Inc. v. Fulbright & Jaworski, L.L.P.*, 178 S.W.3d 40, 43 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The relationship may be expressly created by contract, or it may be implied from the actions of the parties. *Sutton v. Estate of McCormick*, 47 S.W.3d 179, 182 (Tex. App.—Corpus Christi 2001, no pet.); *Mellon Serv. Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 437 (Tex. App.—Houston [1st Dist.] 2000, no pet.). The parties should clearly and expressly agree to the nature of the work to be done and the compensation to be paid, but the agreement may sometimes be implied from the parties' conduct. *Valls v. Johanson & Fairless, L.L.P.*, 314 S.W.3d 624, 633–34 (Tex. App.—Houston [14th Dist.] 2010, no pet.). There must be some manifestation that both parties intended to create an attorney-client relationship. *Id.* at 634. One party's mistaken belief is not sufficient, by itself. *Id.* Thus, whether there was a meeting of the minds between the parties to create an attorney-client relationship is determined under an objective standard examining what the parties said and did, not by the parties' subjective states of mind. *See Bright v. Addison*, 171 S.W.3d 588, 596 (Tex. App.—Dallas 2005, pet. denied); *Roberts v. Healey*, 991 S.W.2d 873, 880 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

29

However, an attorney-client relationship is not created when a person hires an attorney in a non-legal capacity, such as "when a person hires an attorney to draft an instrument but does not seek the attorney's advice with respect to that instrument." *In re Bivins*, 162 S.W.3d 415, 419–20 (Tex. App.—Waco 2005, orig. proceeding) (citing *Pondrum v. Gray*, 298 S.W. 409, 412 (Tex. Comm'n App. 1927, holding approved), *State v. Delany*, 149 S.W.3d 655, 662 (Tex. App.—Houston [14th Dist.] 2004), *rev'd on other grounds*, 197 S.W.3d 297 (Tex. 2006), *Sutton*, 47 S.W.3d at 184–85, and *Harlandale Indep. Sch. Dist. v. Cornyn*, 25 S.W.3d 328, 332 (Tex. App.—Austin 2000, pet. denied)). "In such cases, the attorney is considered a 'mere scrivener.'" *Id.* at 420. When the evidence does not conclusively establish that an attorney-client relationship existed that would impose the duty to inquire into the substance of the contract rather than to serve as a mere scrivener between two parties, the question is properly submitted to the fact-finder. *Sutton*, 47 S.W.3d at 182.

Proximate cause has two elements: cause in fact and foreseeability. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). "These elements cannot be established by mere conjecture, guess, or speculation." *Id.* (quoting *Doe*, 907 S.W.2d at 477). Thus, expert testimony generally is required to prove causation in a legal malpractice suit. *See Alexander*, 146 S.W.3d at 119–20. The test for cause

in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred. *Urena*, 162 S.W.3d at 551.

### ii. Trial court's findings

The trial court found that "Luk did not want to pay the $60,000 purchase price to Nguyen unless a lawyer drew up their agreement and Nguyen signed it" and that "Luk wanted a lawyer to witness the promises and representations made by Nguyen and guarantee that Nguyen sold the restaurant to Luk." The trial court found that after Vuong asked Nguyen for the lease to the premises and Nguyen stated that he forgot to bring it, "Vuong continued with the transaction and did not again ask to see the lease or any writing from the landlord relating to the proposed transaction." Vuong did not contact Rosenbaum, nor did he otherwise verify that Rosenbaum had consented to assign the lease. The trial court also found that Vuong knew the importance of Rosenbaum's consent and advised Luk "that he needed to have everything related to this transaction in writing," but he did not advise Luk that he could lose his investment if Rosenbaum rejected the assignment of the lease.

The trial court found that Vuong included numerous terms in the bill of sale that were not suggested or agreed to by Luk and Nguyen, including "a disclaimer of fact or promises relating to the transferred properties" and a disclaimer of any representation made by Nguyen, "a clause involving [Probate Code] section 500,"

31

a waiver of jury trial, and a choice of law provision. The trial court further found that, although Nguyen told Vuong and Luk that he had permission from Rosenbaum to assign the lease and both Nguyen and Luk considered the assignment of the lease an essential term of their agreement, the bill of sale "drafted by Vuong did not include any identification of the lease, the terms of the lease, or the representations made by Nguyen and relied upon by Luk relating to the assignment of the lease." Rather, "Vuong advised Luk and Nguyen that the document properly memorialized their agreement and that they could close the transaction."

The trial court further found that Vuong exercised legal judgment and discretion in drafting the bill of sale and offered legal advice regarding the transaction and that Luk relied upon Vuong's representation that the bill of sale reflected his understanding of the agreement with Nguyen to purchase Wild Wild Wings. The trial court found that Luk reasonably relied on Vuong's legal education, training, and experience in preparing a document that he could rely upon as a buyer of a restaurant that leases space and that Luk reasonably relied on Vuong's judgment in not asking to see the lease or any written document relating to the lease, not calling Rosenbaum, and stating that the bill of sale memorialized the agreement and representations of Nguyen.

The trial court found that Luk paid Vuong $300 to prepare the bill of sale and have the paperwork executed. It found that Vuong "formed an attorney-client relationship with Luk by offering to perform a legal service for $300, being paid the fee quoted by the client, performing the services asked of him, not restricting the scope of representation, not disclaiming the attorney-client relationship, and offering legal advice or opinion relating to the transaction." The trial court further found that Vuong represented both the seller and the buyer in the transaction and breached various duties in his representation of Luk. The trial court found that "an attorney of ordinary prudence could not have allowed a client to purchase a restaurant where there was a foreseeable, substantial risk of loss after paying the purchase price"; that Vuong could have prevented Luk's losses, but failed to do so even though he had a duty to act; and that Vuong's legal malpractice was a cause-in-fact and proximate case of Luk's losses. The trial court found that "the landlord's rejection of the assignment and ejection of Luk was a foreseeable consequence of Vuong's failure to act or properly advise Luk if Nguyen's representations turned out to be false, which they were."

### iii.    *Attorney-client relationship*

Vuong challenges the trial court's finding that an attorney-client relationship existed between himself and Luk. He argues that the entire meeting lasted only twenty-five minutes, and Luk and Nguyen were in a hurry to complete the

33

transaction, so he did not have the time to do anything but draft the bill of sale. He also argues that Luk simply wanted an attorney to "witness" his purchase of the business, and Luk paid $300 for the drafting of the contract. Luk did not request that Vuong perform any due diligence, he refused Vuong's offer to pursue a written assignment of the lease from Rosenbaum, and he did not pay the $1,500 Vuong stated would be required for him to conduct the due diligence.

However, Vuong's arguments ignore evidence from the record that supports the trial court's findings that he and Luk had an attorney-client relationship that was not limited in its scope. Nguyen and Luk both testified that Luk would not sign an agreement with Nguyen until he had an attorney draft the documents because he wanted to protect himself. Nguyen also testified that Vuong spoke privately with Luk about the transaction. Although Vuong testified that he offered to conduct due diligence for Luk and to obtain the written assignment of the lease in exchange for $1,500, Luk testified that Vuong made no such offer to him.

Vuong himself testified that he advised Luk that the landlord was the most important person in the transaction and that he and Nguyen needed to speak to Rosenbaum and get the agreement in writing. He testified that both Nguyen and Luk told him Rosenbaum had agreed to the transaction. Vuong stated that he explained to Luk the proper procedure for purchasing a business that leases space, including describing documents Nguyen needed to give Luk upon closing the

34

transaction, and he advised Luk not to hurry into the transaction. Finally, Vuong drafted the bill of sale after discussing with both Nguyen and Luk the terms of their agreement, and he agreed that he represented to them that the document reflected their agreement. Both Nguyen and Luk had previously testified that they believed the assignment of the lease was an essential part of the transaction.

We conclude that there is more than a scintilla of evidence that Vuong's and Luk's objective representations and actions demonstrated an intention to create an attorney-client relationship. *See Bright*, 171 S.W.3d at 596; *Roberts*, 991 S.W.2d at 880. Vuong's own testimony, in addition to that of Nguyen and Luk, supported the trial court's finding that Luk did more than hire Vuong to act as a "mere scrivener" in drafting the agreement, but that Luk sought, and Vuong provided, advice with respect to the bill of sale and the transaction generally. Although Vuong told Luk that he needed to obtain the assignment of the lease in writing, the trial court appropriately found that he failed to advise Luk of the consequences of following through with the transaction before he obtained that document. Vuong also represented to Luk that the bill of sale properly reflected his agreement with Nguyen and protected Luk's interests despite the fact that the document left out the essential terms related to the assignment of the lease and included several provisions not discussed by Nguyen or Luk, such as the disclaimers of prior representations that favored Nguyen. *See In re Bivins*, 162 S.W.3d at 419–20

35

(holding that attorney-client relationship does not arise when person hires attorney to draft instrument but does not seek attorney's advice with respect to instrument).

Furthermore, the evidence is factually sufficient to support the trial court's finding of an attorney-client relationship between Vuong and Luk that extended beyond merely recording the agreement of the parties in the bill of sale. When viewed in the context of all of the evidence presented at trial, Vuong's own testimony that the scope of the relationship, and therefore the scope of his duty to Luk, was limited by the lack of time and money to conduct due diligence is not so overwhelming as to indicate that the judgment was against the great weight and preponderance of the evidence. *See Cain*, 709 S.W.2d at 176; *Arias*, 265 S.W.3d at 468.

### iv.    *Breach*

The evidence is legally and factually sufficient to support the trial court's findings that Vuong breached the duties he owed to Luk. The trial court found that "Vuong continued with the transaction to closing without contacting the landlord to find out if Nguyen's representations were true or writing those representations into the Bill of Sale" and that "Vuong advised Luk and Nguyen that the document properly memorialized their agreement and that they could close the transaction." However, as the trial court found, the bill of sale did not include any identification of the lease, the terms of the lease, or the representations made by Nguyen and

36

relied upon by Luk relating to the assignment of the lease. Rather, the bill of sale expressly "disclaimed any representation made by Nguyen with respect to the property, which contradicted the expressed agreement between Nguyen and Luk."

These findings are supported by the evidence, including the plain language of the bill of sale and the testimony of Luk, Nguyen, and Vuong. Nguyen testified that he understood that Luk was paying $60,000 for everything in the restaurant, including the assignment of the lease. Luk also testified that Nguyen assured him that Rosenbaum would allow Luk to operate the restaurant under Nguyen's lease for three months and would then give Luk a new lease for five years at the rate of $800 per month. Vuong testified that, at the time he drafted the bill of sale, he understood that Rosenbaum's consent to the assignment of the lease was an important part of Luk and Nguyen's agreement. However, nothing regarding those terms was included in the bill of sale. Thus, the evidence was legally sufficient to support the trial court's findings. *See City of Keller*, 168 S.W.3d at 819.

Although Vuong testified, and the trial court found, that he advised Luk that he should have Rosenbaum's consent to the assignment of the lease in writing, Vuong failed to advise Luk regarding the potential consequences of failing to get the assignment in writing. Vuong also failed to draft the bill of sale to reflect the entirety of Luk and Nguyen's agreement. Thus, viewing all of the evidence

37

presented at trial, the trial court's judgment was supported by factually sufficient evidence. *See Cain*, 709 S.W.2d at 176; *Arias*, 265 S.W.3d at 468.

### v. *Causation*

Finally, Vuong challenges the trial court's findings that any negligence on his part was the cause of Luk's damages. Vuong argues that Luk's damages were caused by his abandonment of the premises. He argues that Luk "was not concerned with a new lease, as he continued [to] operate the restaurant and to pay the landlord under the terms of the existing lease." He argues that Rosenbaum did not seek to evict Luk, but that Luk left because all of his employees had quit.

As we already discussed above, the argument that Luk caused his own damages by abandoning the lease is unavailing. Luk's testimony supported the trial court's conclusion that Luk was concerned about the lack of a lease. Luk testified that he asked Rosenbaum to assign the lease when he delivered the April rent, and Rosenbaum refused. Luk then felt that he had been cheated and had no right to the restaurant because he could not obtain a lease, so he left the premises. Rosenbaum likewise testified that he would never have assigned the lease to Luk and that the only reason he had not already acted to evict Luk from the premises was because he did not know that Nguyen had sold the restaurant to Luk until the day that Luk left the property.

Furthermore, the trial court made multiple findings of fact regarding Vuong's negligence. The trial court found, among other facts, that "Vuong breached the standard of care or duty owed to Luk by failing to advise Luk that he could lose his investment if Nguyen did not have the landlord's prior written consent to assign the lease to Luk" and that "[a]n attorney of ordinary prudence would have advised a client that failure to obtain the landlord's written consent to purchase a business leasing property before purchasing the business could result in the lease being terminated without notice to the buyer or seller, and cause the prospective buyer to lose his investment and start-up capital." The trial court also found that these breaches were the proximate cause of Luk's injuries and that Luk relied upon Vuong's representation that the bill of sale reflected the agreement between himself and Nguyen.

These findings are supported by the evidence we have discussed above. Despite his advice that Luk "have everything . . . in writing," Vuong failed to fully advise Luk regarding the potential consequences of failing to have Rosenbaum's written consent to assign the lease. This evidence supports the trial court's findings and conclusions that an attorney of ordinary prudence "could not have allowed" the sale to proceed under these circumstances, when "there was a foreseeable, substantial risk of loss after paying the purchase price," and that

39

Vuong breached his duty to Luk "by allowing him" to proceed under such circumstances.

Furthermore, Luk and Nguyen both testified that Luk would not sign the agreement with Nguyen until he obtained the services of an attorney. This testimony supports the trial court's findings that Luk "relied on Vuong's legal education, training and experience in preparing documents he could rely on as a buyer of a restaurant that leases space" and upon "Vuong's judgment in not asking to see the lease or any written document relating to the lease, not calling the landlord, and being told the Bill of Sale memorialized the agreement and representations of Nguyen."

The trial court also found that Luk's damages were caused not only by Vuong's representations and advice concerning the lease, but also by his failure to incorporate Nguyen's representations about the assignment of the lease and the parties' intentions into the bill of sale. This finding on causation is likewise supported by the evidence. Both Luk and Nguyen testified that they intended to include the assignment of the lease as part of the transaction. Luk, Nguyen, and Vuong all testified that they understood that the assignment of the lease was an important part of the transaction. Frederick Dailey, Luk's attorney expert witness, testified that Vuong's negligence in drafting the bill of sale "without protecting against the potential of not having an approved assumption of the lease" caused

Luk's damages. Dailey stated that Vuong could have protected against that potential situation in "a number of different ways," including conditioning the bill of sale on Rosenbaum's written approval to assign the lease or including a clause for refund of the purchase price if Rosenbaum refused the assignment.

Thus, there is more than a scintilla of evidence supporting the trial court's numerous findings that Vuong's negligence in drafting the bill of sale and advising Luk about the transaction was a substantial factor in causing Luk to execute the agreement with Nguyen, without which the harm would not have occurred. *See Urena*, 162 S.W.3d at 551. Nor was the judgment against the great weight and preponderance of the evidence. *See Cain*, 709 S.W.3d at 176; *Arias*, 265 S.W.3d at 468.

We overrule Vuong's second and third issues.[5]

## Conclusion

We affirm the judgment of the trial court.

## PER CURIAM

Panel consists of Justices Keyes, Massengale, and Brown.

Keyes, J., concurring in part and dissenting in part.

---

[5] Vuong also challenges the trial court's finding that he represented both Luk and Nguyen without making the proper disclosures or obtaining written waivers. Because we conclude that the evidence relating solely to the relationship between Vuong and Luk was sufficient to support the judgment, we do not address those complaints.

41